**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
148 West 24th Street, 8th Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiff,*
*FLSA Collective Plaintiffs,*
*and the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| ANGELICA VELAZQUEZ, *on behalf of herself,* *FLSA Collective Plaintiffs, and the Class,* | Case No: |
| Plaintiff, | **CLASS AND COLLECTIVE ACTION COMPLAINT** |
| v. | |
| MILMAR FOOD GROUP, LLC, MILMAR FOOD GROUP II, LLC, MILMAR LLC, TITAN STAFFING SYSTEMS, INC., MARTIN HOFFMAN, and WILLIAM ALMONTE, | |
| Defendants. | |

---

Plaintiff ANGELICA VELAZQUEZ (hereby, "Plaintiff" or "Plaintiff VELAZQUEZ"), on behalf of herself and others similarly situated, by and through her undersigned attorneys, hereby file this Class and Collective Action Complaint against Defendants, MILMAR FOOD GROUP, LLC, MILMAR FOOD GROUP II, LLC, MILMAR LLC, TITAN STAFFING SYSTEMS, INC. (together, the "Corporate Defendants"), MARTIN HOFFMAN, and WILLIAM ALMONTE (the "Individual Defendants" and collectively with the Corporate Defendants, the "Defendants") and states as follows:

1

## INTRODUCTION

1.      Plaintiff alleges, pursuant to the Fair Labor Standards Act, as amended, 29 U.S.C. §§ 201 *et. seq.* ("FLSA"), that she and similarly situated individuals are entitled to recover from Defendants: (1) unpaid wages, including overtime wages, due to time shaving (2) liquidated damages, and (3) attorneys' fees and costs.

2.      Plaintiff alleges that, pursuant to the New York Labor Law ("NYLL"), she and similarly situated individuals are entitled to recover from Defendants: (1) unpaid wages, including overtime wages, due to time shaving, (2) unpaid spread of hours premiums, (3) liquidated damages, (4) statutory penalties due to WTPA violations, and (5) attorneys' fees and costs.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this controversy pursuant to 29 U.S.C. §216(b), 28 U.S.C. §§1331, 1337 and 1343, and has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

4.      Venue is proper in the Southern District pursuant to 28 U.S.C. §1391.

## PARTIES

5.      For all relevant periods, Plaintiff was a resident of New York County, New York.

6.      Individual Defendant MARTIN HOFFMAN is the owner, president and CEO of MILMAR FOOD GROUP, LLC.

7.      Corporate Defendants MILMAR FOOD GROUP, LLC, MILMAR FOOD GROUP II, LLC, MILMAR LLC, are each a foreign limited liability company organized under the laws of the State of Delaware and authorized to do business in the State of New York, with a principal place of business located at One 6 ½ Station Road, Goshen, NY 10924.

8.      Corporate Defendant TITAN STAFFING SYSTEMS, INC. is a foreign business corporation organized under the laws of the State of New Jersey, with a headquarters located at 179 Prospect Street Passaic, NJ 07055.

9.      Individual Defendant WILLIAM ALMONTE is the owner, president and CEO of TITAN STAFFING SYSTEMS, INC.

10.     Corporate Defendants MILMAR FOOD GROUP, LLC, MILMAR FOOD GROUP II, LLC, MILMAR LLC (collectively, "MILMAR FOOD GROUP") collectively operate a company known as Milmar Food Group which is under the control of Individual Defendant MARTIN HOFFMAN and specializes in the manufacturing and distribution of frozen food products. MILMAR FOOD GROUP owns and operates a 60,000 square foot manufacturing and distribution plant on 60 acres of land, located at 6 ½ Station Road, Goshen, NY 10924 (hereby, the "Factory").

11.     Corporate Defendant TITAN STAFFING SYSTEMS, INC. ("TITAN") is a staffing agency which provides temporary and permanent staffing to employers around the United States. TITAN is operated under the control and direction of Individual Defendant WILLIAM ALMONTE.

12.     Individual Defendant MARTIN HOFFMAN is the owner, president and CEO of Corporate Defendant MILMAR FOOD GROUP, LLC, which controls and operates the other Milmar Corporate Defendants MARTIN HOFFMAN exercises operational control as it relates to all employees including Plaintiff, FLSA Collective Plaintiffs, and the Class. MARTIN HOFFMAN frequently visits the Milmar factory. MARTIN HOFFMAN exercises—and also delegates to managers and supervisors—the power to fire and hire employees, supervise and control employee work schedules and conditions of employment, and determine the rate and method of compensation of employees including those of Plaintiff, FLSA Collective Plaintiffs,

and the Class. At all times, employees of the Corporate Defendants could complain to MARTIN HOFFMAN directly regarding any of the terms of their employment, and MARTIN HOFFMAN would have the authority to effect any changes to the quality and terms of employees' employment, including changing their schedule, compensation, or terminating or hiring such employees. MARTIN HOFFMAN exercised functional control over the business and financial operations of the Corporate Defendants. MARTIN HOFFMAN had the power and authority to supervise and control supervisors of Plaintiff, FLSA Collective Plaintiffs, and Class Members, and could reprimand employees.

13.     Individual Defendant Individual Defendant WILLIAM ALMONTE is the owner, president and CEO of Corporate Defendant TITAN STAFFING SYSTEMS, INC. WILLIAM ALMONTE exercises operational control as it relates to all employees including Plaintiff, FLSA Collective Plaintiffs, and the Class. WILLIAM ALMONTE frequently visits the TITAN locations, including the location which issued Plaintiff's pay stubs. WILLIAM ALMONTE exercises—and also delegates to managers and supervisors—the power to fire and hire employees, supervise and control employee work schedules and conditions of employment, and determine the rate and method of compensation of employees including those of Plaintiff, FLSA Collective Plaintiffs, and the Class. At all times, employees of the Corporate Defendants could complain to WILLIAM ALMONTE directly regarding any of the terms of their employment, and WILLIAM ALMONTE would have the authority to effect any changes to the quality and terms of employees' employment, including changing their schedule, compensation, or terminating or hiring such employees. WILLIAM ALMONTE exercised functional control over the business and financial operations of the Corporate Defendants. WILLIAM ALMONTE had the power and authority to supervise and

control supervisors of Plaintiff, FLSA Collective Plaintiffs, and Class Members, and could reprimand employees.

## DEFENDANTS' JOINT BUSINESS OPERATIONS

14.    At all relevant times, TITAN employed and paid Plaintiff, FLSA Collective Plaintiffs, and Class Members to work for MILMAR FOOD GROUP at the Factory.

15.    At all relevant times, the staffing relationship between Defendants MILMAR FOOD GROUP and TITAN was bound to a written contract (the "Staffing Contract"). In a prior case against MILMAR FOOD GROUP, MILMAR FOOD GROUP filed a third-party complaint which details that "TITAN STAFFING provided plaintiff [a former joint employee of the Defendants] to MILMAR FOOD GROUP pursuant to a written staffing contract." *See* EF011032/2018, Dkt. No. 15, ¶ 10 (action involving Milmar Food Group, LLC, *et al.* as defendants and third-party plaintiffs seeking indemnification from Titan Staffing Systems, Inc.).

16.    At all relevant times, Defendants' Staffing Contract was in full force and effect.

17.    At all relevant times, Defendants MILMAR FOOD GROUP and TITAN were contractually obligated to provide proper working conditions and compensation to Plaintiff, FLSA Collective Plaintiffs, and Class Members.

18.    At all relevant times, Defendants MILMAR FOOD GROUP and TITAN were joint employers of Plaintiff, FLSA Collective Plaintiffs, and Class Members.

19.    At all relevant times, Defendants MILMAR FOOD GROUP and TITAN both directly and actually exercised substantial and immediate control over the employment terms, conditions, and circumstances of Plaintiff, FLSA Collective Plaintiffs, and Class Members (including, but not limited to, employees' wages, benefits, working conditions, hours of work, assignment of duties, scheduling, management, and human resource relations). For example,

management from both MILMAR FOOD GROUP and TITAN controlled Plaintiff's scheduling, such that if Plaintiff needed time off, she made such requests to management at both MILMAR FOOD GROUP and TITAN. Moreover, although Plaintiff's pay checks were issued by TITAN, MILMAR FOOD GROUP controlled the number of hours Plaintiff worked during any given pay period.

20.    At all relevant times, Defendants MILMAR FOOD GROUP and TITAN all directly and actually fired, hired, and reprimanded MILMAR FOOD GROUP's employees, including Plaintiff, FLSA Collective Plaintiffs, and Class Members.

21.    At all relevant times, Defendants MILMAR FOOD GROUP and TITAN both directly and actually determined the rates of pay and methods of payment for Plaintiff, FLSA Collective Plaintiffs, and Class Members.

22.    At all relevant times, Defendants MILMAR FOOD GROUP and TITAN both directly and actually managed the payroll and compensation of Plaintiff, FLSA Collective Plaintiffs, and Class Members.

23.    At all relevant times, Defendants MILMAR FOOD GROUP and TITAN both directly and actually maintained employment records for Plaintiff, FLSA Collective Plaintiffs, and Class Members.

24.    At all relevant times, Plaintiff, FLSA Collective Plaintiffs, and Class Members were required to make all requests for time off directly to both Defendants. Employees were required to directly notify both Defendants of other important matters as well.

25.    At all relevant times, Defendants MILMAR FOOD GROUP and TITAN both directly and actually managed employee relations for Plaintiff, FLSA Collective Plaintiffs, and Class Members.

26.     At all relevant times, Defendants MILMAR FOOD GROUP and TITAN directly shared an adequate amount and degree of control over Plaintiff's, FLSA Collective Plaintiffs', and Class Members' employment which classifies the two Defendants as joint employers of Plaintiff, FLSA Collective Plaintiffs, and Class Members during the relevant period.

27.     In a prior case by Defendants MILMAR FOOD GROUP, Defendants MILMAR FOOD GROUP filed a complaint which claims they employed over 200 active employees at the time of filing. *See* EF003101-2017, Dkt. No. 1, ¶¶ 1, 41 (action initiated by Milmar Food Group, LLC, *et al.* related to worker's compensation insurance). Therefore, there are well over 200 FLSA Collective Plaintiffs and Class Members.

28.     At all relevant times, each Corporate Defendant had a gross annual revenue in excess of $500,000.

29.     At all relevant times, each Corporate Defendant was and continues to be an "enterprise engaged in commerce" within the meaning of the FLSA and the NYLL.

30.     At all relevant times, the work performed by Plaintiff, FLSA Collective Plaintiffs, and Class Members was directly essential to the business operated by Defendants.

## **FLSA COLLECTIVE ACTION ALLEGATIONS**

31.     Plaintiff brings claims for relief as a collective action pursuant to FLSA Section 16(b), 29 U.S.C. § 216(b), on behalf of all non-exempt factory workers (including production associates, food processors, assembly workers, food preparers, packers, among others) employed by Defendants on or after the date that is six years before the filing of the Complaint in this case as defined herein (herein, "FLSA Collective Plaintiffs").

32.     At all relevant times, Plaintiff and the other FLSA Collective Plaintiffs are and have been similarly situated, have had substantially similar job requirements and pay provisions, and

are and have been subjected to Defendants' decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in a willful failure and refusal to pay Plaintiffs and FLSA Collective Plaintiffs their proper wages, including their overtime premiums at one and a half times their regular rates for all hours worked over forty (40) in a workweek, due to Defendants' policies of time shaving. The claims of Plaintiff stated herein are essentially the same as those of the other FLSA Collective Plaintiffs.

33.     The claims for relief are properly brought under and maintained as an opt-in collective action pursuant to § 16(b) of the FLSA, 29 U.S.C. 216(b). The FLSA Collective Plaintiffs are readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided to FLSA Collective Plaintiffs via first class mail to the last address known to Defendants.

## RULE 23 CLASS ALLEGATIONS

34.     Plaintiff brings claims for relief pursuant to the Federal Rules of Civil Procedure ("F.R.C.P.") Rule 23, on behalf of all non-exempt factory workers (including production associates, food processors, assembly workers, food preparers, packers, among others) employed by Defendants on or after the date that is six years before the filing of the Complaint in this case as defined herein (the "Class" or "Class Members").

35.     The Class Members are readily ascertainable. The number and identity of the Class Members are determinable from the records of Defendants. The hours assigned and worked, the position held, and rates of pay for each Class Member may also be determinable from Defendants' records. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided by means permissible under F.R.C.P. 23.

8

36.     The proposed Class is so numerous such that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. Although the precise number of such persons is unknown because the facts on which the calculation of that number rests presently within the sole control of Defendants, there is no doubt that there are more than forty (40) members of the Class.

37.     Plaintiff's claims are typical of those claims that could be alleged by any member of the Class, and the relief sought is typical of the relief, that would be sought by each member of the Class in separate actions. All the Class members were subjected to the same corporate practices by Defendants, as alleged herein, of Defendants' failure to pay all wages, including overtime, due to: (1) time shaving, (2) failing to compensate spread of hours premiums, (3) failing to provide proper wage and hour notices, at dates of hiring and annually thereafter, per requirements of the New York Labor Law, and (4) failing to provide proper wage and hour statements, per requirements of the New York Labor Law. Defendants' corporate-wide policies and practices affected all Class Members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each Class member. Plaintiff also alleges that Defendants breached contracts with each other which harmed Plaintiff and Class Members as third-party beneficiaries of these contracts. Plaintiff and other Class Members sustained similar losses, injuries, and damages arising from the same unlawful policies, practices, and procedures of Defendants.

38.     Plaintiff is able to fairly and adequately protect the interests of the Class and has no interests antagonistic to the Class. Plaintiff is represented by attorneys who are experienced and competent in both class action litigation and employment litigation and have previously represented plaintiffs in wage and hour cases.

39.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy – particularly in the context of the wage and hour litigation where individual class members lack the financial resources to vigorously prosecute a lawsuit against corporate defendants. Class action treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender. Because losses, injuries and damages suffered by each of the individual Class Members are small in the sense pertinent to a class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Class Members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the claims as a class action would result in a significant saving of these costs. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendants and resulting in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

40.     Defendants and other employers throughout the state violate the New York Labor Law. Current employees are often afraid to assert their rights out of fear of direct or indirect retaliation. Former employees are fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class actions provide

class members who are not named in the Complaint a degree of anonymity, which allows for the vindication of their rights while eliminating or reducing these risks.

41.     There are questions of law and fact common to the Class which predominate over any questions affecting only individual class members, including:

    a)  Whether Defendants employed Plaintiff and Class Members within the meaning of the New York Labor Law;

    b)  What are and were the policies, practices, programs, procedures, protocols, and plans of Defendants regarding the types of work and labor for which Defendants did not pay Plaintiff and Class Members properly;

    c)  At what common rate, or rates subject to common methods of calculation, was and are Defendants required to pay Plaintiff and Class Members for their work;

    d)  Whether Defendants properly notified Plaintiff and the Class Members of their hourly rates and overtime rates;

    e)  Whether Defendants paid Plaintiff and Class Members their owed spread of hours premiums;

    f)  Whether Defendants paid Plaintiff and Class Members for all hours they worked;

    g)  Whether Defendants provided Plaintiff and Class Members with proper wage and hour notices, at their dates of hiring and annually, per requirements of the New York Labor Law;

    h)  Whether Defendants provided Plaintiff and Class Members with proper wage statements with each payment of wages, as required by New York Labor Law;

i) Whether Defendants paid Plaintiff and Class Members New York State minimum wage for all hours worked;

## STATEMENT OF FACTS

*Plaintiff's Employment Background*

42.     In or around January 2001, Plaintiff was hired by Defendant TITAN to work as a Packaging Specialist at Defendant MILMAR FOOD GROUP's factory located at One 6 ½ Station Road, Goshen, NY 10924. Plaintiff's employment with both Defendants ended in or around November 2024.

43.     Throughout her employment, Plaintiff was scheduled by Defendants to work five (5) days per week (Mondays through Fridays), from 7:00 a.m. to 3:30 p.m., with a thirty (30) minute meal break each day, for a total of forty (40) hours per week. Additionally, during the November and December holiday season every year of Plaintiff's employment, Defendants required Plaintiff to work from 6:00 a.m. to 4:00 p.m. for 5 days a week, for a total of fifty (50) hours per week. FLSA Collective Plaintiffs and Class Members worked similar schedules.

44.     At all relevant times, Plaintiff was compensated by Defendants at or slightly above the prevailing New York State minimum hourly wage rates and paid weekly by check.

*Unpaid Wages due to Time shaving*

45.     At all relevant times, Defendants failed to compensate Plaintiff, FLSA Collective Plaintiffs, and Class Members their proper wages for all hours they worked, due to Defendants' policy of time shaving, in violation of the FLSA and the NYLL.

46.     At all relevant times, Defendants did not require Plaintiff, FLSA Collective Plaintiffs, and Class Members to clock in/out or otherwise record their hours worked. Instead, Defendants only paid them for their scheduled hours.

47.     At all relevant times, Defendants scheduled Plaintiff to work forty at least (40) hours each week. However, Defendants regularly required Plaintiff to work additional hours outside of this 40 hour schedule. Excluding the holiday months, generally November/December, Defendants did not pay Plaintiff for the hours worked above her scheduled shift, but instead only paid her for exactly forty (40) hours each week. FLSA Collective Plaintiffs and Class Members were similarly not paid for hours worked in excess of forty (40) each week.

48.     Specifically, Defendants hired many employees who lived far from the Factory and had drivers who picked up and dropped off employees between pick-up/drop-off points and the Factory. In Plaintiff's case, she was required to meet her assigned driver at West 179th St. & Broadway, New York, NY 10033 every workday at approximately 5:00 a.m. to be picked-up. She would board the vehicle between 5:00 a.m. to 5:30, depending on when the driver arrived, and would then be transported to the Factory 60 miles away. FLSA Collective Plaintiffs and Class Members were also required to arrive at the pick-up sites at similar times to be transported to the Factory.

49.     While onboard the vehicle, Plaintiff would discuss the workday and other work-related issues with her co-workers. Plaintiff and her co-workers would discuss working conditions, issues with supervisors, issues related to their pay, and also plan their workday at the Factory. During the entirety of this time, Plaintiff, FLSA Collective Plaintiffs, and Class Members were under Defendants' control and should have been paid for this time but were not.

50.     Because of this transportation situation, Plaintiff arrived at the Factory significantly earlier than her scheduled shift. Upon arriving at the Factory, Plaintiff was required to begin working at 6:45 a.m. but was only paid from the start of her scheduled shift, which began at 7:00 a.m. As a result, Plaintiff was time shaved between 1 hour and 30 minutes to 1 hour and 45 minutes

each day, due to unpaid pre-shift work, which includes the time spent under Defendants' control after pick-up until the start of her scheduled shift at 7:00 a.m. FLSA Collective Plaintiffs, and Class Members were similarly time shaved.

51.     During Plaintiff's employment, she was also required to work 15-30 minutes past the end of her scheduled shift on a daily basis, but was not paid for this time, since Defendants only paid her for her scheduled shift. Plaintiff, FLSA Collective Plaintiffs, and Class Members were similarly required to work past the end of their scheduled shifts, but not paid for this time due to Defendants' time shaving.

52.     At all relevant times, FLSA Collective Plaintiffs and Class Members were similarly subjected to the same time shaving policies and required by Defendants to engage in unpaid labor on a daily basis without any compensation.

53.     At all relevant times, Defendants knowingly and willfully operated their business with a policy of failing to pay wages to Plaintiff, FLSA Collective Plaintiffs, and Class Members for all hours they worked, due to Defendants' policy of time shaving, in violation of the FLSA and the NYLL.

54.     At all relevant times, Defendants knowingly and willfully operated their business with a policy of failing to pay Plaintiff and FLSA Collective Plaintiffs for all hours engaged in waiting to work, due to Defendants' policy of time shaving, in violation of the FLSA.

55.     Defendants' knowledge and willfulness of their failure to compensate employees for all hours worked and spent waiting to work is clearly evident. Defendants intentionally sought out and hired employees who had to rely on Defendants' transportation – people who lived far from the Factory and do not own their own transportation, such as Plaintiff who lived approximately 60 miles from the Factory and had no choice but to utilize Defendants' private

employee transportation service in order to travel to and from work every day. Defendants then intentionally planned and scheduled for these employees to arrive to work as early as possible as part of their scheme to cause employees to engage in unpaid labor. FLSA Collective Plaintiffs and Class Members were all required to arrive early due to Defendants' transportation and scheduling and were also required to engage in unpaid pre-shift work.

56.    Additionally, Defendants intentionally failed to record employees' hours worked in order to pay employees only for their scheduled hours despite requiring employees to work outside of these scheduled shifts.

*Claims of Unpaid Spread of Hours Premiums*

57.    At all relevant times, Defendants failed to compensate spread of hours premiums to Plaintiff and Class Members for all days they worked with a spread of ten (10) or more hours, in violation of the NYLL.

58.    Throughout her employment, Plaintiff was required by Defendants to work workdays with a spread of ten (10) or more hours throughout the November and December each year. Class Members were similarly required by Defendants to workdays with a spread of ten (10) or more hours.

59.    However, Defendants failed to pay Plaintiff and Class Members their owed spread of hours premiums for every workday lasting ten (10) hours.

60.    Defendants knowingly and willfully operated their business with a policy of not compensating Plaintiff and Class Members their properly owed spread of hours premiums, in violation of the NYLL. Defendants' awareness and willfulness is apparent because Defendants regularly scheduled Plaintiff and Class Members to work shifts of ten (10) hours or longer workdays and failed to compensate them with any spread of hours premiums accordingly.

*Claims of WTPA Violations*

61.    At all relevant times, Plaintiff and Class Members never received a wage notice from Defendants.

62.    At all relevant times, Plaintiff and Class Members did not receive proper wage statements from Defendants.

63.    In violation of the Wage Theft Protection Act ("WTPA")—incorporated into NYLL—Defendants knowingly and willfully operated their business with a policy of not providing wage notices to Plaintiff and Class Members at the beginning of their employment with Defendants.

64.    In failing to provide proper wage statements and notices, Defendants have failed to comply with the law in a manner that entails a concrete harm to an interest identified by the New York State legislature. As one Court observed:

> Here, Plaintiffs allege that Defendants failed to furnish them with proper wage notices and statements, as required by NYLL §§ 195(1) and 195(3). These provisions were enacted as part of New York's Wage Theft Prevention Act ("WTPA"), N.Y. Lab. Law § 195, which sought "to expand the rights of employees to seek civil and criminal avenues of remedy for their employers failing to follow labor law appropriately and the specifications therein." N.Y. Spons. Mem., 2010 S.B. 8380. More specifically, the New York State Assembly passed the WTPA to address studies showing that a large number of employees were not being paid the wages owed to them, and that many employers were not adequately informing their employees of their wages and how they are calculated in language the employees could understand. *Id.* The New York State Assembly opined that existing penalties did not adequately deter employers from paying less than the wages owed, and stated that the WTPA would dramatically change this by increasing penalties for violating employees' rights. *Id.*

*Imbarrato v. Banta Mgmt. Servs*., 2020 U.S. Dist. LEXIS 49740, *21-22 (S.D.N.Y. March 20, 2020)

65.    Here, Defendants' failure goes beyond generating a risk of harm to Plaintiff and Class Members. Defendants' conduct actually harmed Plaintiff and Class Members. Defendants'

failure to provide wage notices and paystubs listing all hours actually worked and rates of pay, including overtime hours and overtime rates, deprived employees of the ability to contest the pay provided by Defendants, allowed Defendants to hide their wrong-doing, and necessitated the current litigation to vindicate Plaintiff's and Class Members' rights. This conduct ensured Defendants' ability to further delay providing proper compensation to low wage earners entitled to protection under federal and state law. Defendants' failure to provide wage notices and wage statements to employees allowed Defendants to hide their responsibility and deprive employees of timely compensation.

66.    Had Defendants provided to Plaintiff and Class Members proper wage statements, as required by law, Defendants would have had to either (a) increase the wages to correspond to the spread of hour premiums earned and reflect their unpaid wages or (b) forthrightly acknowledge, by way of the wage statement, that the employee's wages did *not* correspond to the premiums that the employee actually earned. Either possibility would have allowed Plaintiff and Class Members to vindicate their rights under the NYLL. The deprivation of these possibilities therefore constitutes an injury.

67.    The failure to provide proper wage notices and wage statements continues to result in delayed payment of all proper wages owed to Plaintiff and Class Members. This delayed payment caused Plaintiff and Class Members to struggle to pay bills and other debts.

68.    The direct effect of understating the number of hours an employee worked is to reduce the wages that employees are listed as having earned on their wage statements. The direct effect of this, in turn, is to reduce the employee earnings that the employer later reports to the IRS through the employee's W-2 form, as such information is derived from the information on employees' wage statements. *See Mills v. Mills*, 2021 Minn. Dist. LEXIS 200, at *5 (Minn. Dist.

Ct., Anoka County, Tenth Judicial District May 20, 2021) ("Petitioner's gross annual income, based on her 2020 W-21 and paystub dated 12/24/20, is $130,321.30"); *T.F. v. N.F.*, 820 N.Y.S.2d 846, 846 (Sup. Ct., Suffolk Cty., June 22, 2006) ("In 2005 the Plaintiffs earned $ 133,086 as reflected on his final year paystub and W-2").[1]

69.    The effect of reporting reduced wages on an employees' W-2 is, in turn, to reduce the amount of social security benefits available to the employee, as an employee's entitlement to benefits reflects how much money he or she is reported as having contributed to the social security system. *See McGauran v. Soc. Sec. Comm'n*, 2001 U.S. Dist. LEXIS 3187, at *7 (N.D. Cal. March 19, 2001) ("Social security benefits are based upon the worker's earnings as reported to the [SSA] . . . [and] the worker's earnings are used to determine insured status for entitlement to retirement and to calculate cash benefit rates." (quoting Social Security Administration, Handbook § 1400 (1997)); *Coward v. Zurich Am. Ins. Co.*, 2011 U.S. Dist. LEXIS 74543, at *3 (N.D. Ill. July 8, 2011) ("Under the Social Security statute, entitlement depends on 'the total of the wages paid . . . to an individual in a calendar year.'") (quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

70.    "In the wake of the Supreme Court's decision in *TransUnion*, courts in this Circuit have held that plaintiffs lack standing to bring wage notice and statement claims under the NYLL absent any concrete, downstream consequences of the recordkeeping violation." *Chen v. Lilis 200 W. 57th Corp.*, 2023 U.S. Dist. LEXIS 38163, at *18 (S.D.N.Y. Mar. 7, 2023). "On the other hand,

---

[1] It is true that the wages reported on W-2 forms are not always precisely identical to those listed on an employees' last paystub for the year. One reason for is, as the IRS explains, that "W-2 wages include: (i) the total amount of wages as defined in section 3401(a); (ii) the total amount of elective deferrals (within the meaning of section 402(g)(3)); (iii) the compensation deferred under section 457; and (iv) the amount of designated Roth contributions (as defined in section 402A)." https://www.irs.gov/pub/irs-drop/rp-19-11.pdf. However, the possibility, that wages listed on a W-2 might be affected by such considerations does not change the fact that the base wages on the W-2 are derived from paystubs. The paystub processing service *realcheckstubs* explains:  "A pay stub contains crucial information that assists in calculating W2 wages. Paystub provides gross wages, deductions, taxes withheld, and other income-related data. Individuals gather the necessary figures required for accurate W2 calculation by referring to the pay stub." https://www.realcheckstubs.com/blog/paystubs/6-steps-how-to-calculate-w-2-wages-from-paystub.

'allegations' that go 'beyond asserting a bare statutory violation and sufficiently allege concrete harm' resulting from 'the underpayment of wages' pass muster because 'monetary injury is a concrete harm sufficient for purposes of Article III standing.'" *Thompson v. Elev8 Ctr. N.Y., LLC*, 2023 U.S. Dist. LEXIS 122504, at *21 (S.D.N.Y. July 17, 2023) (quoting *Mateer v. Peloton Interactive, Inc.*, 2022 U.S. Dist. LEXIS 125017, at *4 (S.D.N.Y. July 14, 2022)).

71.     Here, it is clear that Defendants' failure to provide Plaintiff and Class Members with accurate wage statements entailed "concrete, downstream consequences" involving monetary injury. Had the spread of hours premiums been accurately reported for a given pay period, Defendants' automatic payroll system would have correspondingly increased the wages due for that period, which in turn would have been reflected in the W-2s that Defendants submitted to the IRS on behalf of Plaintiff and Class Members. That, in turn, would have increased Plaintiff's and Class Members' entitlement to social security benefits. Because the inaccuracy prevented this outcome, it constitutes an injury sufficient to provide Plaintiff with Article III standing.

72.     Courts agree that the misreporting of wages constitutes a concrete injury cognizable under Article III:

> The Seventh Circuit in *Calderon* squarely addressed FICA standing. The plaintiffs in *Calderon* were former employees alleging the employer failed to pay their FICA taxes. 999 F.2d at 1105-06. The Seventh Circuit found that the plaintiffs lacked standing to compel the employer to pay their FICA taxes because "[b]enefits do not. . . depend on whether the employer actually paid the taxes." *Id.* at 1106. Plaintiffs could, however, enforce FICA's reporting requirement because it is the reporting of income that triggers benefits, and losing benefits is an injury under *Lujan*. *Id.* Whether the employer in *Calderon* made FICA payments on the plaintiffs' behalf had no bearing on the plaintiffs' entitlement to benefits. *Id.* "[T]he Plaintiffs' real interest lies in ensuring that the [employer] make the proper reports of their income." *Id.*

*Coward*, 2011 U.S. Dist. LEXIS 74543, at *3-4.

73.    The case at bar is somewhat different from *Coward* inasmuch as Defendants actually underpaid Plaintiff and other employees rather than merely misreporting their income. But this distinction has no bearing on the question of Article III standing, since it is still the case that "it is the reporting of income that triggers benefits, and losing benefits is an injury." *Id*. Plaintiff and Class Members lost benefits by virtue of how Defendants reported their income, and how Defendants reported employees' income was the direct outcome of the inaccuracies in employees' wage statements. That is why "Plaintiffs have standing to enforce the statutory reporting requirements" imposed by the WTPA. *Calderon v. Witvoet*, 999 F.2d 1101, 1106 (7th Cir. 1993).

74.    Whether or not any Class Members are presently eligible for social security benefits is legally immaterial. *See id*. ("Although only citizens and aliens residing in the United States may receive benefits, 42 U.S.C. § 402(t), plaintiffs may eventually fulfill this requirement and therefore are entitled to keep their Social Security accounts accurate.").

75.    The *Calderon* court stressed that an employee's interest in ensuring that an employer properly report the employee's income is amplified by the difficulty of persuading the government to correct errors:

> The practical difficulty is that eligibility for Social Security benefits presumptively depends on reports that employers send to the government. A worker who seeks credit for unreported income bears the burden of proof, 42 U.S.C. § 405(c)(3), (4), which will be hard to carry if the employer has not furnished the customary documentation. The government believes employers who report earnings, because these reports are costly to make--they entail paying a substantial tax. The government tends not to believe undocumented claims by employees, because these claims are essentially costless yet could establish entitlement to large pensions or disability benefits.

> All of this means that the plaintiffs' real interest lies in ensuring that the Witvoets make the proper reports of their income. *Id.*

76.     Here, the problem is not merely challenging but insurmountable. Plaintiff and Class Members cannot even attempt to have their earnings report corrected because Defendants *did* report what they actually paid Plaintiff and Class Members. The problem, rather, is that Plaintiff and Class Members were underpaid. Yet the ultimate effect is the same—reduced social security eligibility. Because "[u]nder the Social Security statute, entitlement depends on 'the total of the wages paid . . . to an individual in a calendar year,'" Plaintiffs was irreversibly injured with respect to his social security benefits as soon as Defendants sent his W-2 to the IRS. *Coward*, 2011 U.S. Dist. LEXIS 74543, at *3 (N.D. Ill. July 8, 2011) (quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

77.     Defendants knowingly and willfully operated their business with a policy of failing to provide Plaintiff and Class Members with wage notices and accurate wage statements, in violation of the NYLL.

78.     Plaintiff retained Lee Litigation Group, PLLC to represent Plaintiff, FLSA Collective Plaintiffs, and Class Members in this litigation, and has agreed to pay the firm a reasonable fee for its services.

## STATEMENT OF CLAIM

## COUNT I

## VIOLATION OF THE FAIR LABOR STANDARDS ACT

79.     Plaintiff realleges and incorporates all the above allegations of this Complaint as fully set forth herein.

80.     At all relevant times, Defendants were and continue to be employers engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a). Further, Plaintiff and FLSA Collective Plaintiffs are covered individuals within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207 (a).

81.     At all relevant times, Defendants employed Plaintiff and FLSA Collective Plaintiffs within the meaning of the FLSA.

82.     At all relevant times, Defendants had a policy and practice that failed to pay Plaintiff and FLSA Collective Plaintiffs their properly owed wages for all hours worked, due to a policy of time shaving.

83.     Records, if any, concerning the number of hours worked by Plaintiff and FLSA Collective Plaintiffs and the actual compensation paid to Plaintiff and FLSA Collective Plaintiffs should be in the possession and custody of the Defendants. Plaintiff intends to obtain these records by appropriate discovery proceedings to be taken promptly in this case and, if necessary, will then seek leave of Court to amend this Complaint to set forth the precise amount due.

84.     Defendants knew of and/or showed a willful disregard for the provisions of the FLSA as evidenced by their failure to compensate Plaintiff and FLSA Collective Plaintiffs their proper wages, including their proper wages and overtime premiums, when Defendants knew or should have known such was due.

85.     Defendants failed to properly disclose or apprise Plaintiff and FLSA Collective Plaintiffs of their rights under the FLSA.

86.     As a direct and proximate result of Defendants' willful disregard of the FLSA, Plaintiff and FLSA Collective Plaintiffs are entitled to liquidated (i.e., double) damages pursuant to the FLSA.

87.     Due to the intentional, willful, and unlawful acts of Defendants, Plaintiff suffered damages in an amount not presently ascertainable of unpaid wages, including unpaid overtime wages, and liquidated damages.

88.    Plaintiff and FLSA Collective Plaintiffs are entitled to an award of their reasonable attorneys' fees and costs pursuant to 29 U.S.C. §216(b).

## COUNT II

## VIOLATION OF THE NEW YORK LABOR LAW

89.    Plaintiff realleges and incorporates all the above allegations of this Complaint as fully set forth herein.

90.    At all relevant times, Plaintiff and Class Members were employed by the Defendants within the meaning of the New York Labor Law, §§ 2 and 651.

91.    Defendants willfully violated Plaintiff's and Class Members' rights by subjecting them to a policy of failing to pay wages for all hours worked due to time shaving.

92.    Defendants willfully violated Plaintiff's and Class Members' rights by failing to pay them any spread of hour premiums for all their shifts worked in excess of ten (10) hours.

93.    Defendants failed to properly notify employees of their hourly pay rate and overtime rate, in direct violation of the New York Labor Law.

94.    Defendants failed to provide Plaintiff and Class Members with proper wage and hour notices, at their dates of hiring and annually, per requirements of the New York Labor Law.

95.    Defendants failed to provide Plaintiff and Class Members with proper wage statements with every payment as required by New York Labor Law § 195(3).

96.    Due to the Defendants' New York Labor Law violations, Plaintiff and Class members are entitled to recover from Defendants: their unpaid wages, unpaid overtime wages and premiums, unpaid spread of hours premiums, liquidated damages, statutory penalties, reasonable attorneys' fees, and costs and disbursements of this action, pursuant to New York Labor Law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself, FLSA Collective Plaintiffs, and Class Members, respectfully request that this Court grant the following relief:

a.  A declaratory judgment that the practices complained of herein are unlawful under the FLSA and the NYLL;

b.  An injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

c.  An award of unpaid wages, including overtime wages and premiums, as a result of time shaving, due under the FLSA and the NYLL;

d.  An award of unpaid spread of hours premiums, due under the NYLL;

e.  An award of statutory penalties as a result of Defendants' failure to comply with New York Labor Law wage notice and wage statement requirements;

f.  An award of liquidated and/or punitive damages as a result of Defendants' willful failure to pay wages pursuant to 29 U.S.C. § 216;

g.  An award of liquidated and/or punitive damages as a result of Defendants' willful failure to pay wages pursuant to the NYLL;

h.  Restitution and disgorgement of all amounts obtained by Defendants as a result of their misconduct, together with interest thereon from the date of payment;

i.  An award of pre-judgment and post-judgment interests, costs, and expenses of this action together with reasonable attorneys' and experts' fees and statutory penalties;

j.  Designation of this action as a collective action pursuant to 29 U.S.C. § 216(b);

k.    Designation of Plaintiff as Representative of the FLSA Collective Plaintiffs;

l.    Designation of this action as a class action pursuant to F.R.C.P. 23;

m.    Designation of Plaintiff as Representative of the Class;

n.    Such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable as of right by jury.

Dated: May 19, 2025                              Respectfully submitted,
       New York, New York

                              By:    /s/ *C.K. Lee*
                                     C.K. Lee, Esq. (CL 4086)
                                     **LEE LITIGATION GROUP, PLLC**
                                     148 West 24th Street, 8th Floor
                                     New York, NY 10011
                                     Tel.: 212-465-1188
                                     Fax: 212-465-1181
                                     *Attorneys for Plaintiff,*
                                     *FLSA Collective Plaintiffs,*
                                     *and the Class*